**BLANK ROME LLP**
*A Pennsylvania LLP*
Michael J. Conlan
Seth J. Lapidow
New Jersey Resident Partners
David C. Kistler
Daniel L. Stackhouse
301 Carnegie Center
Princeton, NJ 08540
Phone: (609) 750-7700
Facsimile: (609) 750-7701
*Attorneys for Plaintiff*
*Heartland Payment Systems, Inc.*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HEARTLAND PAYMENT SYSTEMS, INC., | Civil Action No.:2:11-3354(SRC)(MAS) |
| Plaintiff, | |
| v. | |
| CARRIE NOTHEIS AND CLEARENT, LLC, | |
| Defendants. | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF HEARTLAND PAYMENT SYSTEMS, INC.'S APPLICATION FOR A PRELIMINARY INJUNCTION**

Of Counsel:
Michael J. Conlan
Seth J. Lapidow

On the Brief:
David C. Kistler
Daniel L. Stackhouse

128904.00726/50402369v.2

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................. 1

REPLY ARGUMENT .............................................................................................................. 1

POINT I:   Contrary to Defendant's Arguments, Heartland Has A Reasonable
           Probability Of Success On Its Breach of Contract Claim ........................................ 1

      A.   Defendant Has Improperly Solicited Heartland Employees .................................... 1

      B.   Defendant Has Improperly Solicited Heartland Merchants ..................................... 3

      C.   The Non-Solicitation Provision Covers Any Heartland Merchants
          That Notheis Brought From Her Previous Employer ............................................... 4

      D.   Heartland Did Not Breach The Vested Relationship Manager Agreement
          And Is Entitled To Enforce That Contract Against Defendant ................................ 6

POINT II:  Notheis Will Suffer No Harm By Issuance Of Injunctive Relief
           And A Balancing Of The Hardships And The Public Interest
           Weigh In Favor Of Issuing Injunctive Relief ........................................................... 8

POINT III: The Proposed Injunctive Relief Is Neither Vague Nor Impermissible .................... 9

CONCLUSION ........................................................................................................................ 10

128904.00726/50402369v.2

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*A.T. Hudson & Co., Inc. v. Donovan*,
   216 N.J. Super. 426 (App. Div. 1987) ..................................................................................5

*Coskey's Television v. Foti*,
   253 N.J. Super. 626 (App. Div. 1992) ..........................................................................4, 5, 6

*Delareto v. Totaro*,
   2010 N.J. Super. Unpub. LEXIS 2370 (N.J. Super. App. Div. Sept. 29, 2010) ........................8

*Nolan v. Lee Ho*,
   120 N.J. 465 (1990) ..............................................................................................................7

*Platinum Mgmt., Inc. v. Drahms*,
   285 N.J. Super. 274 (Law Div. 1995) ..............................................................................5, 8

*Scholastic Funding Group, LLC v. Kimble*,
   2007 WL 1231795 (D.N.J. April 24, 2007) ..........................................................................5

*Trico Equipment, Inc. v. William Manor*,
   2009 U.S. Dist. LEXIS 50524 (D.N.J. June 13, 2009) .........................................................9

*United States v. All Right*,
   2009 U.S. Dist. LEXIS 93086 (D.N.J. Oct. 5, 2009) ............................................................6

*Whitmyer Bros., Inc. v. Doyle*,
   58 N.J. 25 (1971) ..................................................................................................................5

128904.00726/50402369v.2

**PRELIMINARY STATEMENT**

The unequivocal evidence demonstrates that Carrie Notheis planned and executed a scheme to leave Heartland and take both merchants and other employees with her. In her own words, this effort "to get other sales professionals over to Clearent" was to be executed "under the radar from HPS." To that end, while still employed by Heartland, Notheis sent Heartland merchant applications and other confidential information to Clearent and helped Heartland employees to apply for jobs there. These efforts violated the covenants to which she admits being bound.

Having switched over customers and employees, Notheis now offers various excuses for her conduct. But none of these excuses changes the fact that Heartland has been injured by Notheis' breach of her duties and Notheis will suffer no harm from the strict enforcement of her obligations.

**REPLY ARGUMENT**

**POINT I**

**Contrary To Defendant's Arguments, Heartland Has A
Reasonable Probability Of Success On Its Breach Of Contract Claim**

  A. **Defendant Has Improperly Solicited Heartland Employees**

As a condition of her nearly ten-year employment by Heartland, Notheis promised that during her employment with Heartland and for a 24-month period after termination for any reason, she would not "***directly or indirectly solicit, recruit or hire*** any employee of HPS to work for a third party other than HPS ***or engage in any activity that would cause any employee to violate any agreement with HPS***." (*See* Kallenbach Decl., Ex. A at § 7) (Emphasis added).[1]

---

[1] Heartland incorporates as if set forth fully herein its July 8, 2011 Memorandum of Law in Support of its Application for a Preliminary Injunction, the accompanying Declaration of Charles Kallenbach, and all exhibits appended to the Kallenbach Declaration.

-1-

Contrary to Notheis' argument, the inquiry is not whether she personally persuaded a Heartland employee to move to Clearent, but whether she "indirectly" facilitated that move in any way. Under the unambiguous terms of her Vested Relationship Manager Agreement ("RM Agreement") -- terms Notheis does not dispute -- any action by Notheis that helped Clearent recruit a Heartland employee to Clearent is a violation. Worse, any action by Notheis that helped another Heartland employee breach their duty to Heartland is a violation. It is beyond dispute that Notheis did both.

Notheis' own emails demonstrate that while still employed by Heartland she plotted to "get other sales professionals over to Clearent . . . under the radar from HPS . . . ." (Kallenbach Decl., Ex. B.) And she put that plan into effect, both during and after her employment at Heartland.

In one instance, Notheis identified a likely prospect for Clearent. On May 4, while working at Clearent, Notheis forwarded an email from HPS employee, Melinda Bell, to Clearent CEO, Geraty, noting that Bell was a "Kansas City candidate we need to look at in the upcoming weeks to come." (*See* August 29, 2011 Declaration of David Kistler ("Kistler Decl."), Ex. A.) In another instance, Notheis induced Tammy Ormson, a Heartland employee, to send her the confidential performance data for Heartland's sales personnel. (*See* Kistler Decl., Ex. B.) Ostensibly, this assisted Clearent with identifying the top sales personnel at Heartland for recruiting purposes. Later, Ormson was rewarded and on July 21, 2011 -- <u>after</u> Heartland had already filed this application to enjoin her wrongful conduct -- Notheis emailed Geraty to ask "who would set up the business cards and the internet set up (sic) for Tammie Ormson." (Kistler Decl., Ex. C.) Last, while still employed by Heartland, Notheis even went so far as to draft her

-2-

assistant's email to Clearent asking for a job. That assistant, Michelle Swisher, is now her assistant at Clearent. (*See* Kistler Decl., Ex. D.)

### B.     Defendant Has Improperly Solicited Heartland Merchants

The evidence shows that Notheis conceived and executed a plan to leave Heartland and take merchants with her. She bragged to Clearent CEO Dan Geraty that she could do this notwithstanding her contract with Heartland:

> *My merchant base doesn't leave. They are here for the duration and will follow. Their new businesses will follow. That is the nature of the business we are in. They have my back like I have theirs.*

(Kallenbach Decl., Ex. B at 3) (emphasis added). And, true to her prediction, customers left Heartland for Clearent when she did.

Notheis tries to paint an innocent picture of the flight of customers to Clearent, but this effort fails as the discrepancies in Notheis' story -- and the affidavits submitted in support of her story -- are manifest.[2] For example, there are no client affidavits or other sworn statements explaining how CDM Sports and Fanball.com became Clearent merchants. And even after Heartland filed its application for a preliminary injunction, Notheis has unabashedly continued to convert her former merchants from Heartland to Clearent. (*See* Kistler Decl., Ex. E, 07/14/11 email from Robyn Sciacca of Restaurant Pi to Notheis.) This demonstrates why an injunction is necessary.

---

[2] Notheis tries to make hay of the fact that since Heartland sued to enforce her obligations under the RM Agreement she has referred three "merchant leads" to Heartland, including Dino's, Van Gogz and one other unnamed merchant. But this "good behavior" comes on the heels of her many violations and was conveniently timed to be included in her opposition to Heartland's application. (Kistler Decl., Ex. F.)

### Claus Schmitz

Notheis had Claus Schmitz, owner of Mosaic, Barcelona and Bocci, certify that "when I learned Carrie was at Clearent (which I did not learn from Carrie), my brother Frank and I decided to move our business to Clearent." But this simply cannot be true because Notheis submitted Bocci's application for processing with Clearent on March 28, 2011 - ***before*** she even resigned from Heartland. Indeed, according to Notheis, she "did not decide to go to Clearent until after…[she] left Heartland in April, 2011." (Notheis Aff., ¶ 9.)

Notheis also had Mr. Schmitz certify that the decision to leave Heartland was based on service issues and the fact that he could not obtain a satisfactory explanation for why Heartland was reprogramming his terminals in the summer of 2011. But this story doesn't add up either as Mr. Schmitz never reached out to Heartland or asked why Heartland was reprogramming his terminal. (*See* August 29, 2011 Declaration of Amy Culwell ("Culwell Decl."), ¶ 4.) Moreover, when Heartland employee Heather Bouvier called Mr. Schmitz in July 2011 to see if there was a problem with Heartland's service, Mr. Schmitz advised her that there was nothing wrong with the service. (*See* August 29, 2011 Declaration of Heather Bouvier ("Bouvier Decl."), ¶ 3.)

### David Sinclair

Notheis had David Sinclair certify that he wanted to move his business to Clearent because of Notheis and that Notheis did not solicit his business. But "Sandy", an accounting employee of David Sinclair, informed Heartland employee Heather Bouvier on July 29, 2011 that Notheis induced David Sinclair to switch to Clearent by promising that she would not have to pay Heartland's early termination fee. (Bouvier Decl., ¶ 4.)[3]

---

[3] Heartland charges its merchants an early termination fee of $295.00.

### C. The Non-Solicitation Provision Covers Any Heartland Merchants That Notheis Brought From Her Previous Employer

Notheis contends that based on the ruling in *Coskey's Television v. Foti*, 253 N.J. Super. 626, 633 (App. Div. 1992) she is not bound by the restrictions in her contract because the merchants she moved to Clearent were "her clients" from her employer before Heartland and that, as a matter of law "[w]hat [the employee] brought to his employer, he should be able to take away." But on the facts here, this argument is wrong.

The general rule in New Jersey is that the ongoing professional relationship between an employer and its clients is a legitimate business interest that is properly protected through a restrictive covenant. *Whitmyer Bros., Inc. v. Doyle*, 58 N.J. 25, 33 (1971); *A.T. Hudson & Co., Inc. v. Donovan*, 216 N.J. Super. 426 (App. Div. 1987) (holding that employee was prohibited from soliciting business from customers of his former consulting firm). *A.T. Hudson* recognizes "the significant business interest of [the employer] which the covenant was designed to protect" and the fact that sales organizations "expend great energy and money in soliciting clients and developing projects for their benefit. Each client that plaintiff was able to attract represents a significant investment of time, effort and money which is worthy of protection." *Id.* at 433-434.

The court in *Coskey's Television* expressly acknowledged that it was articulating a limited, fact-specific exception to this general rule, and departed from the rule only because the employment contract at issue involved a broad covenant not to compete in a niche industry with a very small and finite number of possible customers, which together had the effect of prohibiting the employee from working in the industry in any fashion. 253 N.J. Super. at 638-39.

Thus, the court found that enforcement of that covenant "would make [the employee] little more than a highly-paid indentured servant." *Id* at 636. Here, in contrast, the restriction in the RM Agreement is a narrow one, prohibiting only the solicitation of existing Heartland

customers and leaving a multitude of potential customers for Notheis to solicit for Clearent. Thus, as in *Scholastic Funding Group, LLC v. Kimble*, 2007 WL 1231795 *5 (D.N.J. April 24, 2007), "this case is readily distinguishable from the facts of *Coskey's Television*." *See also Platinum Mgmt., Inc. v. Drahms*, 285 N.J. Super. 274, 299 (Law Div. 1995) ("contrary to GAF's contention, the mass market customers for the toys involved here are not so limited in number or generally known in the trade as to preclude protection against GAF's dealing with them during that one-year period, provided they were existing customers of PMI before Dahms left its employ. Their patronage had to be developed by PMI or Dahms, often as a result of a personal relationship. This situation is not in any wise similar to the finite group of customers dealt with by all competitors in the field, as in *Coskey's, supra,* 253 N.J.Super. at 638-39, 602 A. 2d 789.").

Indeed, even if the *Coskey's* test applied here, it fails because many of the merchants from whom Notheis submitted affidavits in opposition to this preliminary injunction application were signed up by Notheis *years after she began working for Heartland in 2002*:

- Lucas Park Grille was signed up as a Heartland merchant on April 21, 2009 (Kistler Decl., Ex. G.);
- David Sinclair Buick-GMC was signed up as a Heartland merchant on January 6, 2009 (*Id.*);
- Mosaic was signed up as a Heartland merchant on August 25, 2009 (*Id.*);
- Rosalita's Cantina was signed up as Heartland merchant on October 14, 2010 (*Id.*); and
- Bocci and Barcelona Tapas were both signed up as Heartland merchants on February 11, 2011. (*Id.*).

Moreover, Notheis has submitted ***no evidence*** to support her contention that she brought any of the pilfered merchants to Heartland from her previous employer. Absent such evidence, the Court should give no credence to her unsupported assertions. *United States v. All Right*, 2009 U.S. Dist. LEXIS 93086, at *29-35 (D.N.J. Oct. 5, 2009), *aff'd*, 2010 U.S. App. LEXIS 17262 (statements of fact that lack any citation to the record should be disregarded).

-6-

## D. Heartland Did Not Breach The Vested Relationship Manager Agreement And Is Entitled To Enforce That Contract Against Defendant

Notheis tries to justify her conduct by asserting that Heartland breached the RM Agreement, making the non-solicitation provisions unenforceable. Specifically, Notheis contends that: (i) Heartland "failed and refused" to pay her any of the residuals that accrued since her resignation; (ii) Heartland did not resolve commission calculation errors; and (iii) Heartland did not pay her a promised $73,000 bonus. (Opp. Br. at 1-4 and 27-28.) These claims fail for several reasons.

First, the doctrine of "prior material breach" upon which Notheis appears to rely requires exactly what its name suggests – a prior material breach by one party that subsequently excuses the other party's performance of its contractual obligations. *Nolan v. Lee Ho*, 120 N.J. 465, 472 (1990). Here, Notheis breached the confidentiality and non-solicitation covenants long before she left Heartland and triggered any post-employment obligations on Heartland's part. Thus, the doctrine is inapplicable here.

Second, Heartland simply has not violated any payment obligations under Notheis' contract. As explained in detail in the attached Declaration of Mindy Moretti, Senior Business Analyst with Heartland, Notheis currently has a $25,217.54 accounts receivable debt to Heartland based on her overestimation of margins for new merchants and resulting overpayments made to Notheis in the form of signing bonuses. Heartland has properly applied Notheis' residual payments to her A/R balance and has not breached the RM Agreement. (*See* August 29, 2011 Declaration of Mindy Moretti and attachments thereto.)

Last, with respect to a purported $73,000 bonus, Heartland's contractual obligations to Notheis do not include the payment of any such bonus. To the extent any such bonus was discussed, it was an oral agreement outside the scope of the RM Agreement. The RM

-7-

Agreement is a fully integrated agreement that can only be modified or amended in writing and signed by both the RM and an authorized Heartland officer:

> 11.  Miscellaneous.
>
> ….
>
> (e) Entire Agreement.  This Agreement supersedes any and all prior written or oral agreements, representations and warranties made by or between HPS and Relationship Manager, or between RM and any predecessor of HPS, and constitutes the entire agreement between the parties hereto with respect to such subject matter.
>
> (f)  Modification or Amendment.  No modification or amendment to this Agreement shall be effective unless in writing and signed by RM and an authorized officer of HPS.

(Kallenbach Decl, Ex. A at §§ 11(e) and 11(f).)   Thus, even if Heartland failed to pay the bonus, it is not a breach of -- and cannot serve as a basis to preclude Heartland from enforcing -- the RM Agreement.  *Delareto v. Totaro*, 2010 N.J. Super. Unpub. LEXIS 2370, *9-10 (N.J. Super. App. Div. Sept. 29, 2010) (holding that integration clause barred consideration of alleged oral loan agreement); *see also Platinum Mgmt.*, 285 N.J. Super. at 303 (holding that employer's failure to pay bonus to former employee is not a sufficiently material breach to excuse the employee's duty to perform covenant not to compete).

## POINT II

### Notheis Will Suffer No Harm By Issuance Of Injunctive Relief And A Balancing Of The Hardships And The Public Interest Weigh In Favor Of Issuing Injunctive Relief

Notheis makes no argument that the confidentiality and non-solicitation provisions of the RM Agreement are invalid, overbroad or oppressive.  Instead, the thrust of her opposition to Heartland's application for injunctive relief is that she is complying with her confidentiality and non-solicitation covenants and has not breached the RM Agreement.  Assuming, *arguendo*, that

her representations are true, Notheis faces no harm or hardship by entry of an order enforcing those obligations.

By contrast, if Heartland's requested relief is denied, it will suffer real and substantial hardship in the form of incalculable lost profits, lost business relationships, and lost productivity. Indeed, Heartland has lost and continues to lose confidential information, merchants and employees to Clearent as a direct result of Notheis' wrongful and unlawful conduct.

New Jersey Courts routinely hold that "[j]udicial enforcement of non-competition provisions of employment contracts serves the public interest by promoting stability and certainty in business and employment relationships." *Trico Equipment, Inc. v. William Manor*, 2009 U.S. Dist. LEXIS 50524, *24 (D.N.J. June 13, 2009). As with the contract at issue in *Trico*, the public will not be harmed by enforcement of the confidentiality and non-solicitation provisions against Notheis because customers are still free to choose between payment processing companies, provided there is no improper solicitation. Moreover, enforcement of the RM Agreement will serve the public by avoiding unfair competition between payment processing providers.

## POINT III

### The Proposed Injunctive Relief Is Neither Vague Nor Impermissible

Defendant's final argument is that the injunctive relief sought be Heartland in its proposed Order is vague and impermissible. But Heartland seeks only the relief to which it is entitled under the Agreement -- to enjoin Defendant from disclosing confidential information and soliciting customers and employees -- and there is nothing vague or impermissible about it. And to the extent the Court perceives any discrepancy between the language of the contract and the relief sought in the proposed order, the Court is of course empowered to craft an appropriate Order.

## **CONCLUSION**

For the foregoing reasons and those set forth in Heartland's moving papers, this Court should grant Heartland's application for a preliminary injunction.

                                                Respectfully submitted,

                                                **BLANK ROME LLP**
                                                *A Pennsylvania LLP*

                                                /s/ Michael J. Conlan
                                                *Attorneys for Plaintiff Heartland Payment Systems, Inc.*

Dated: August 30, 2011

128904.00726/50402369v.2